UNITED DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

JOAN PIPKIN,            )
                          )
        Plaintiff,       )
                          )
vs.                    )   Case No. 1:06CV00073 AGF
                          )
MICHAEL J. ASTRUE,     )
Commissioner of Social security,   )
                          )
        Defendant.     )

## MEMORANDUM AND ORDER

This action is before this Court[1] for judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Joan Pipkin's application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434.  For the reasons set forth below, the decision of the Commissioner shall be affirmed.

Plaintiff, who was born on February 9, 1953, applied for benefits on June 7, 2004, claiming a disability onset date of May 12, 2004, due to osteoarthritis and bulging degenerated discs in her lumbar spine.  After her application was denied at the initial administrative level, Plaintiff requested a hearing before an Administrative Law Judge ("ALJ").  A hearing was held on June 15, 2005, at which Plaintiff and a Vocational Expert ("VE") testified.  On August 19, 2005, the ALJ issued a decision that Plaintiff had the residual functional capacity ("RFC") to perform her past work as a secretary, and was

_____

[1]  The parties have consented to the exercise of authority by the undersigned United States Magistrate Judge under 28 U.S.C. § 636(c).

thus not disabled as defined by the Social Security Act. The Appeals Council of the

Social Security Administration denied Plaintiff's request for review on March 24, 2006.

Plaintiff has thus exhausted all administrative remedies and the ALJ's decision stands as

the final agency action.

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial

evidence in the record. Specifically, she asserts that the ALJ committed reversible error

by requiring objective evidence of pain, by failing to give appropriate weight to Plaintiff's

subjective complaints, and by failing to consider Plaintiff's impairments in combination.

## Work History

Forms submitted by Plaintiff in connection with her application for benefits

indicate that she worked as a secretary from 1989 to 1993 at a recycling plant, and as a

production line worker at a Tyson Foods chicken factory from January 1995 to May 12,

2004 (her alleged disability onset date). At the chicken factory job, Plaintiff bagged

chicken using an automatic bagger. That job required standing six hours in an eight-hour

workday, and frequently lifting 45-pound boxes. During an eight-hour workday at her

secretarial job, Plaintiff walked and stood for a total of one hour each, sat for seven

hours, reached for two hours, and wrote/typed/handled small objects for seven hours.

She did no climbing, stooping, kneeling, crouching, crawling, or handling/grasping big

objects at the secretarial job, and the heaviest item she lifted was four pounds. Tr. at

100-02.

**Medical Record**

Plaintiff saw Ellen Vaughan, R.N./C.S. (clinical specialist),[2] on May 30, 2003, after an incident of high blood pressure at work at the Tyson Foods facility. Plaintiff also complained of pain in the right hip and leg. Nurse Vaughan noted that a hip MRI from December 2002 showed no problems, and scheduled Plaintiff for an MRI of her lumbar spine. Nurse Vaughan assessed hip pain with right sciatica, an incident of elevated blood pressure at work, and anxiety; she prescribed Celebrex and Lexapro. Tr. at 161.

An x-ray of the lumbar spine taken on June 13, 2003, was negative for fracturing, but showed moderate osteoarthritis at L4-L5 region, with narrowing joint space throughout the lumbar spine, especially at the articular facets of the lower spine. An MRI of the lumbar spine on the same date showed minimal bulging, protrusion, and degeneration in one of the discs. Tr. 192-93.

Plaintiff saw Nurse Vaughan on August 15, 2003, with complaints of pain of two to three days duration in the right neck, extending to the shoulder. Nurse Vaughan noted that Plaintiff was in no acute distress, had some mild restriction in lateral movement of the head, good tendon reflexes, strong grip bilaterally, and full range of motion of the upper extremities. Nurse Vaughan assessed neck pain/muscle spasm, for which Plaintiff

---

[2]    Nurse Vaughan is also referred to in the record as a FNP (family nurse practitioner).

was given Zanaflex[3] and Medrol Dosepak,[4] and advised to continue Bextra and to use warm moist compresses; Plaintiff's prescription for Lexapro was also continued. Tr. at 160. On September 12, 2003, Plaintiff was admitted to the emergency room for chest pain, nausea, and shortness of breath. She was discharged that night, after tests showed no problems. Tr. at 175-91.

On May 12, 2004 (the alleged disability onset date), Plaintiff went to see Nurse Vaughan with complaints of pain in her back and shoulder. Nurse Vaughan noted that Plaintiff had tried to continue working at her job, which required lifting ten-pound bags of chicken. Nurse Vaughan further noted that Plaintiff was in tears and that Plaintiff reported that she could not work with the pain, stating that it felt like a knife stabbing her in the back and shoulder, and hurt all the time. Nurse Vaughan diagnosed lumbar disc protrusion with degenerative disc disease, and noted severe back pain, for which she continued Bextra,[5] a Medrol Dosepak, and Darvocet,[6] and recommended physical therapy. Nurse Vaughan also kept Plaintiff off work "for a while." Tr. at 159.

---

[3]    Zanaflex is a short-acting muscle relaxer.

[4]    Medro Doespak is a corticosteroid used to treat arthritis.

[5]    Bextra is a non-steroidal anti-inflammatory drug (it was  removed from the U.S. market in 2005).

[6]    Darvocet is an opioid analgesic used to treat mild to moderate pain.

Bi-weekly physical therapy progress reports from May 12, 2004, through May 28, 2004, indicated that Plaintiff's range of motion and strength increased, but that back pain in her lumbosacral and scapular regions remained fairly constant. Tr. at 167-73.

Meanwhile, on May 21, 2004, Plaintiff saw Nurse Vaughan for follow-up for her back pain. Plaintiff complained that all her bones hurt. Nurse Vaughan noted that Plaintiff was still not moving well, but overall was better than the week before. Plaintiff's expression looked more relaxed, and she was not tearful. Nurse Vaughan noted that Plaintiff had been off work, on medication, and had had some improvement with physical therapy. Nurse Vaughan diagnosed lumbar disc protrusion with degenerative disc disorder, severe back pain, and bone pain, and advised Plaintiff to remain off work for another week. Tr. at 158. When Plaintiff saw Nurse Vaughan on May 28, 2004, Nurse Vaughan again noted that Plaintiff experienced some improvement with physical therapy, but was still under "considerable" discomfort. Plaintiff was going to begin aquatic therapy twice weekly, and did not think that she could return to her job, which required sustained standing and repeatedly lifting 10 pound sacks. Nurse Vaughan again diagnosed lumbar disc protrusion with degenerative disc disease, and severe back pain. Plaintiff was prescribed Skelaxin to add to her regiment of Bextra, heat treatment, and physical therapy. Tr. at 157. On June 4, 2004, Nurse Vaughan again noted some improvement, but that Plaintiff felt she could not return to her regular job due to the demands of the work. Tr. at 156.

Nurse Vaughan completed a disability claim form for Tyson Foods on June 14, 2004, indicating that Plaintiff was disabled due to severe back pain and lumbar disc protrusion, and that these injuries resulted from Plaintiff's continuous standing and repetitive lifting. Nurse Vaughan noted that it was questionable whether Plaintiff could ever return to her regular occupation, but that Plaintiff expressed a desire to return to work if lighter work were available. Nurse Vaughan further noted that Plaintiff's injuries presented marked limitation on Plaintiff's working capabilities, and that she was considering referring Plaintiff for orthopedic surgery. Tr. at 155.

Nurse Vaughan's progress notes from June 18, and July 16, 2004, are essentially the same as her previous notes, indicating that physical therapy was helpful, that Plaintiff was not working, and that the treatment regimen was continued. Tr. at 153-54. Progress notes from July 26, 2004, however, state that Plaintiff reported an incident of bending over at aquatic therapy and feeling a sharp stabbing pain in her right hip and down her leg. Nurse Vaughan wrote that as a result, Plaintiff was "now back to square one." On examination, Plaintiff walked with a very faltering gait, had difficulty getting on and off the exam table. The pain was in the right lumbar paravertebral musculature, and right sciatic nerve, and right leg raises were positive for radiculopathy. A Medrol Dosepak was repeated, Zanaflex was restarted, Darvocet was refilled, and Plaintiff was restricted to minimal weight bearing. Tr. at 152.

On August 4, 2004, James E. Palen, M.D., conducted a disability consultative examination. He noted Plaintiff's history of osteoarthritis in Plaintiff's hands and back,

three bulging discs, pain in her right shoulder and arm, and back pain that started the year before. He also noted that Plaintiff smoked a pack of cigarettes per day. Dr. Palen indicated that Plaintiff's joints were essentially normal, with no inflamation or swelling, and that there was no significant restriction in movement or deformity in Plaintiff's back. Dr. Palen stated that he was "not convinced" that Plaintiff "made a good effort when she was told to perform strength testing." Plaintiff was able to walk on heels and toes, bend, squat, rise from a squatting position, and grasp and shake hands, but was unable to button and unbutton her clothes without limitations or pain. Her gait, posture, and station were normal. Dr. Palen determined that Plaintiff had "no real limitations" in her ability to perform work related activities, including sitting, standing, walking, lifting, carrying, and handling objects. Dr. Palen diagnosed mild osteoarthritis, and a bulging disc of mild degree. Tr. at 147-48.

When Plaintiff was seen by Nurse Vaughan on August 16, 2004, for follow-up, she noted that Plaintiff was attending aquatic therapy, and had improved, but was still having "significant" pain. Plaintiff's physical examination indicated that she was able to get on and off the exam table carefully, that her pain was in the right paravertebral musculature, and that she still had a positive right leg lift for radiculopathy. Plaintiff was assessed with back pain, degenerative disc disease, and lumbar disc protrusion, and was instructed to continue with her current medications. Tr. at 133.

Also on August 16, 2004, a non-examining state agency counselor filled out a physical RFC assessment form, indicating that Plaintiff could occasionally lift/carry 20

pounds, frequently lift/carry ten pounds, stand/walk and sit with normal breaks for about

six hours in an eight-hour work day.  Her ability to push and/or pull, and her

manipulative abilities, including reaching all directions, handling, fingering, and feeling,

were unlimited.  She could frequently climb stairs, balance, kneel, and crawl; and could

occasionally climb ladders, stoop, and crouch.  Tr. at 79-86.

Plaintiff was seen by Nurse Vaughan on August 26, 2004, for complaints of right

shoulder pain, which reportedly felt "like a knife in the shoulder blade."  Plaintiff was

able to raise her arms over her head slowly, but she could not touch her left scapula with

her right fingertips.  Plaintiff was assessed with right shoulder pain, and osteoporosis.

Nurse Vaughan suggested that Plaintiff go to an orthopedist or pain clinic for steroid

injections in her back, but Plaintiff "basically refused," stating that she would not allow

anyone to put needles in her back.  Nurse Vaughan informed Plaintiff that she "probably

will not get her back disability-- especially if she is unwilling to undergo therapy to help

restore her function."  Tr. at 127.

An MRI of the right shoulder on September 7, 2004, showed a probable partial

tear of a tendon with overlying bursa inflammation.  An MRI of the lumbar spine on the

same day showed degenerative disc disease from the L2-L3 to L5-S1, with mild stenosis.

Tr. at 145-46.  At a follow-up physical examination on September 14, 2004, Plaintiff

walked with a "faltering" gait and had trouble getting on and off the exam table.

Plaintiff's lumbar spine was tender to the touch and she had radiculopathy to straight leg

lifts bilaterally.  Plaintiff had approximately 30 degrees flexation and 10-20 degrees

extension of the back without pain, and she was unable to raise her arm above shoulder level without significant discomfort. Nurse Vaughan diagnosed degenerative disc disease and right shoulder pain with a partial tear of a tendon and bursitis. Tr. at 131.

On a follow-up physical examination on October 15, 2004, Plaintiff walked with a "somewhat unnatural gait," and was very hesitant and slow. Plaintiff's lumbar spine was tender to the touch, and she had radiculopathy to straight leg lifts. She was able to raise her arm above her shoulder level, but could not touch her scapula. Plaintiff was assessed with degenerative disc disease, and partial tear of a tendon in the right shoulder, with bursitis. She was to continue with her current treatment plan of Bextra, Darvocet, and aquatic therapy. Tr. at 129.

Plaintiff saw Nurse Vaughan on November 11, 2004, for ongoing management of her back pain and degenerative disc disease. Nurse Vaughan noted that Plaintiff was scheduled for arthroscopic surgery on November 29, 2004, for repair of the torn tendon in her right shoulder. Plaintiff continued with her aquatic therapy twice a week, was currently taking Flexeril, Ibuprofen, and Darvocet, was in no acute distress, and walked with a slow gait. On physical examination, Plaintiff had some right leg sciatica, but her straight leg lifts were negative for radiculopathy. Plaintiff also had 1+ sluggish patellar reflexes bilaterally. Plaintiff was assessed with degenerative bone disease and a partial tear of a tendon in the right shoulder with bursitis. Nurse Vaughan commented that Plaintiff would be kept off work for another month pending surgery on her shoulder. Tr. at 128.

Patrick LaCorps, M.D., performed the arthroscopic surgery on Plaintiff's right shoulder on November 29, 2004. There were no complications with the procedure; post-operative diagnosis was chronic tendinitis, and osteoarthritis in the right shoulder. Tr. at 135-36. Plaintiff saw Nurse Vaughan on December 10, 2004, at which time Nurse Vaughan noted that Plaintiff's hypertension was not well controlled, increased Plaintiff's Micardis (used to treat high blood pressure), and extended Plaintiff's "work excuse" another month. Tr. at 126. When Plaintiff saw Nurse Vaughan on January 10, 2005, Nurse Vaughan noted that Plaintiff had been "getting along fairly well post op until she developed some muscle spasms," for which Dr. LeCorps had prescribed Selaxin. Plaintiff also complained of upper respiratory symptoms, which were intermittent and chronic. Nurse Vaughan assessed degenerative disc disease, and chronic sinusitis, and prescribed Amoxil and Flonase. Tr. at 125.

On February 9, 2005, Plaintiff reported to Nurse Vaughan that her sinusitis was not better, and that she had continued problems with her shoulder. Chronic sinusitis, degenerative disc disease, and hypertension were assessed. Plaintiff was continued on Micardis, her antibiotic was changed to Biaxin, and she was kept off work another month. Tr. at 124.

Nurse Vaughan's progress notes dated March 9, 2005, state that Plaintiff had a slow gait, and had some difficulty getting on and off the exam table. Plaintiff was not able to move her right arm much above shoulder level. Plaintiff was again assessed with chronic sinusitis and degenerative disc disease. An antibiotic (Avelox) and a

decongestant (Medent DM) were prescribed.  Plaintiff reported that she did not feel that she was able to return to work at her previous duties, and that no sedentary job offers were available with her employer.  Nurse Vaughan extended Plaintiff's work excuse "another few months."  Tr. at 122-23.

On March 23, 2005, Plaintiff was seen by Nurse Vaughan after a car accident the previous day, in which Plaintiff was rear ended.  Plaintiff reported neck pain radiating into her shoulders and lower back.  She reported that she did not go to the emergency room after the accident because she was on her way to a funeral, and she did not want to miss it.  On physical examination, Plaintiff had some tenderness in the trapezius bilaterally, some restricted range of motion, tenderness in the lumbar spine paravertebral musculature, with no ecchymosis, bruising, or gross deformities.  She exhibited a normal gait.  She was assessed with neck and lumbar pain, and was to continue with her medications (Flexeril, Bextra, and an anti-inflammatory for degenerative disc disease) and use warm moist compression.  Tr. at 121.  A radiology report dated March 23, 2005, showed mild anterior hypertrophic spurring of the lumbar spine, with mild narrowing of the L4-L5 disc space; and moderate spurring of the cervical spine, with mild narrowing at C6-C7 and only minimal degenerative change elsewhere.  Tr. at 119.

Plaintiff was seen by Nurse Vaughan on April 6, 2005, for continuing pain following the car accident.  Plaintiff reported that she had "a lot of pain" and restricted range of motion in her neck.  On physical examination, Nurse Vaughan noted that Plaintiff was in no acute distress, but that her neck was "rather stiff," and that she was "not moving

it voluntarily much." Plaintiff had "about 20° flexion and about 10° extension." She also had tenderness in the trapezius muscle and the cervical spine. Plaintiff could not raise her right arm even to shoulder level, had significantly diminished grip in her right hand, and could not touch her left scapula with her right fingertip. Nurse Vaughan reported that Plaintiff's lumbar pain was located in the L4-5 to S1 range in the right paravertebral musculature, and that straight leg lifts were negative for radiculopathy. Plaintiff was assessed with cervical pain and restriction in range of motion, and continuing lumbar pain with right upper extremity weakness and range of motion. Tr. at 118.

On a Physical Capacity Evaluation dated April 6, 2005, Nurse Vaughan noted that Plaintiff was able to sit and stand for one hour at a time, had to alternate between sitting and standing every 30-60 minutes, was able to sit for three hours total and stand for four hours total during an eight hour day, could not use her hands/arms for repetitive actions such as reaching, handling, and fingering, had a weak grip with the right hand, and could not use her right foot for repetitive movements such as operating foot controls. Plaintiff, "with both hands," could never lift above 20 pounds, rarely lift 10 to 19 pounds, occasionally lift 5 to 10 pounds, frequently lift up to 4 pounds, never carry objects above 20 pounds, rarely carry objects 10 to 19 pounds, occasionally carry objects 5 to 9 pounds, and frequently carry up to 4 pounds. Plaintiff could occasionally reach above her shoulder level, with left arm only, rarely bend or climb, and never squat. Nurse Vaughan further opined that pain markedly, and fatigue moderately, affected Plaintiff's ability to sustain full time employment. Tr. at 143-144.

An April 7, 2005 MRI of the cervical spine showed minimal osteoarthritis and a slight bulging disc of C5-C6 without spinal stenosis or encroachment of the cervical cord. Tr. at 134. On May 2, 2005, Nurse Vaughan saw Plaintiff for the last time, noting that Plaintiff would continue treatment through a different doctor, and was seeing Dr. LaCorps post-operatively.[7] Nurse Vaughan noted that Plaintiff reported that she had not regained her range of motion or strength in her right arm since her surgery. Nurse Vaughan wrote that she had tried to get Plaintiff to attend physical therapy "almost a year ago," but Plaintiff had stated that she could not afford to pay for physical therapy or a pain clinic. Plaintiff had been going for aquatic therapy "on occasion." On physical examination, Nurse Vaughan noted that Plaintiff's gait was "slightly faltering," she seemed stiff, moaned and complained when straight leg lifts were performed, and had some restriction and range of motion of the neck. Plaintiff was able to turn her head to the left and right about 50 degrees, and her neck movement was restricted by 10 to 20 degrees when moving up and back. Plaintiff was assessed with cervical pain, lumbar pain, right shoulder weakness and range of motion restriction, and degenerative disc disease. Tr. at 116-17.

**Evidentiary Hearing of June 15, 2005**

Plaintiff testified at the evidentiary hearing that she was 52 years old, divorced, lived by herself in a mobile home, had a 12th grade education, and was right handed. She testified that she received monthly benefits of approximately $982.00 for long-term

---

[7]    This name is mistyped in Nurse Vaughan's notes as "Dr. Lacor."

disability from Tyson Foods, her former employer. She had worked at Tyson for nine and one half years, until she went on medical leave in May 2004. She was terminated one year later, as medical leave could only be taken for one year. Plaintiff stated that her job as a secretary at an aluminum recycling plant involved typing and filing. She left that job to work at Tyson, which paid more and had better benefits. Plaintiff stated that she had COBRA health insurance, which she thought would last until June 1, 2006. Tr. at 205-06.

Plaintiff was asked to describe the medical problems which kept her from working. She responded that she could not stand or sit for "very long" at a time, and had limited use of her right arm since her surgery in November. She testified that she smoked about one pack of cigarettes a day. She drove about 80 miles to the hearing. She did her own laundry, and went grocery shopping about once a week. Plaintiff stated that she could lift and carry about five pounds without discomfort, walk about one half a block, stand between 10 to 15 minutes, and sit for about 30 minutes, at one time. She stated that she still had limited use of her right arm and did not have all the motion back, for which she started physical therapy one week prior to the hearing. Her grip with her right hand was not very good. Tr. at 203-10.

Upon examination by her representative, Plaintiff stated that she was never pain-free, and that her worst pain was in her lower back, down her leg. She was taking Darvocet, Naproxen (Aleve), and sometimes Ibuprofen, which helped ease the pain. Plaintiff stated that she could not stoop, squat, or kneel, and that she had difficulty walking up and down stairs. She testified that she slept okay, but did not have a lot of

14

energy in the morning.  Her back "goes out" about once every month and a half for about a week.  During these periods she could not do anything, and needed the help of her sister who lived nearby.  Plaintiff could not vacuum or sweep, and it took her a while to do the dishes.  For entertainment, she played computer games, whereas she used to enjoy hunting and fishing.  Plaintiff claimed that she could not go back to a secretarial job because she had limited use of her right arm and could not stand or sit for very long at a time.  Tr. at 211-16.

A VE testified that a hypothetical individual with Plaintiff's education, age, and work experience and the following functional limitations and abilities could work as a secretary: could not lift and carry more than ten pounds and engage in overhead work with the dominant right upper extremity; could push and pull with the right upper extremity, and stoop and crouch less than occasionally, could sit for six hours and stand and walk for about two hours in an eight-hour workday with customary breaks.  The VE testified that there would be approximately 750 secretarial jobs in Missouri that such an individual could perform.  In response to a question by Plaintiff's representative, the VE testified that if the hypothetical individual could only less than occasionally do simple grasping with the right hand, a secretarial job would be precluded.   Tr. at 217-19.

**ALJ's Decision**

The ALJ found that the medical evidence established that Plaintiff had degenerative disc disease of the lumbar spine and status post arthroscopic surgery on the right shoulder, but that these impairments, singly or in combination, did not medically equal in severity a

15

presumed-disabling impairment listed in the Commissioner's regulations.[8]  After

summarizing the medical evidence and Plaintiff's testimony at the hearing, the ALJ found

that Plaintiff's portrayal of herself as an individual who was significantly restricted due to

her impairments, was not fully credible.  The ALJ stated that Plaintiff's allegations of

lower back pain were "partially credible," but that the objective evidence did not support a

finding that she was limited by this pain to the extent alleged.  In support of this

determination, the ALJ cited Dr. Palen's August 4, 2004 report, which described

Plaintiff's joints as essentially normal, and movement not significantly limited.  The ALJ

stated that there was "reason to question the reliability of tests," such as range of motion

and strength tests that had been performed, "since results can depend to a great degree, on

the amount of effort exerted by the individual being tested," and Dr. Palen stated that he

was "'not convinced' that [Plaintiff] 'made a good effort when she was told to perform

stress testing.'"  The ALJ believed that this lack of effort was the result of Plaintiff being

"so benefit-motivated," that she often put forward "no more than minimal effort to portray

her functioning in the worst possible light."  Tr. at 13-17.

The ALJ found other evidence which he believed showed that Plaintiff "was

motivated to exaggerate symptoms when it suit[ed] her purposes."  He cited Nurse

Vaughan's notation in the August 6, 2005 report, following Plaintiff's car accident, that

Plaintiff "was not moving [her neck] voluntarily much."  Also, the ALJ found a

---

[8]    This finding is listed in the ALJ's summary of his findings.  Tr. at 20.

discrepancy between Plaintiff's very limited flexion and extension on that day and the MRI conducted the next day, showing only minimal osteoarthritis. The ALJ believed that this discrepancy was an indication that Plaintiff magnified her symptoms to enhance a personal injury claim she intended to file related to the accident. Tr. at 17.

The ALJ also stated that there was "considerable evidence" that Plaintiff failed to comply with treatment recommendations which might have helped her functioning and ability to work -- her refusal to have steroid injections in August 2005, and her failure to go for physical therapy or to a pain clinic, per Nurse Vaughan's notation on May 2, 2005. In light of Plaintiff testimony at the hearing that she had COBRA health insurance until June 2006, the ALJ found that her failure to go for physical therapy or to a pain clinic was voluntary and not due to inadequate finances. The ALJ believed that Plaintiff's daily activities -- driving when necessary, doing laundry, going grocery shopping, cleaning, doing laundry, and cooking -- as testified to at the hearing and as described on her June 18, 2004 daily activities report, provided evidence that she could work. Tr. at 17-18.

Similarly, the ALJ found that while Plaintiff might have some residual limitation relating to the surgery on her right shoulder, she was not credible as to the extent of this limitation. The ALJ stated that the only evidence of reduced functioning of Plaintiff's surgically-repaired right should was from Nurse Vaughan, but that this evidence was "mostly anecdotal and based on Plaintiff's reports rather than on observed problems." The ALJ found that Plaintiff's failure to submit any post-surgery records from Dr. LaCorps, whom Nurse Vaughan stated Plaintiff was seeing for surgical follow-up, gave

rise to an inference that such records would not have supported Plaintiff's claim of significant post-surgery limitations. The ALJ found no evidence to support Plaintiff's allegations of a limiting impairment of the cervical spine, and concluded that this was not a severe impairment. Tr. at 18.

The ALJ next explained why he gave Nurse Vaughan's April 6, 2005 assessment of Plaintiff's physical abilities "no weight." According to the ALJ, Nurse Vaughan's assessment was unsupported by objective medical evidence, and inconsistent with her own progress notes and those of other medical sources. As an example, the ALJ pointed to Nurse Vaughan's opinion that Plaintiff could never squat and could rarely bend, which was inconsistent with Dr. Palen's August 4, 2004 opinion that Plaintiff could squat, rise from a squatting position, and bend. The ALJ noted that although Nurse Vaughan was Plaintiff's treating medical source, she was a nurse while Dr. Palen was a physician, and stated, without specific support from the record, that even Nurse Vaughan believed that Plaintiff "could be rehabilitated if she followed medical recommendations." Nurse Vaughan's notation on March 9, 2005, that Plaintiff reported she could not return to her previous duties and there were no sedentary jobs available at work, strongly implied to the ALJ that Plaintiff could do sedentary work. Tr. at 18-19.

The ALJ stated that the pain medications Plaintiff indicated she was taking at the time of the hearing (Naproxen - 500 mg. daily, Ibuprofen - 800 mg. daily, and Darvocet) did not suggest an individual so limited by pain that work would be precluded. He also stated that while Plaintiff's steady work record from 1995 to 2003, would normally

enhance the credibility of her disability-related allegations, here the other factors he had noted outweighed consideration of her good work record. Tr. at 19.

The ALJ stated that after reviewing the entire record, and the factors set forth in Polaski v. Heckler, 751 F.2d 943, 948 (8th Cir. 1984), for evaluating allegations of disability, he found that Plaintiff had the RFC to perform work-related activities except for lifting/carrying more than ten pounds, and standing/walking for more than two hours, or sitting for more than six hours, in an eight-hour workday, and could perform the full range of work at the sedentary exertional level.[9] The ALJ stated that Plaintiff's past work as a secretary did not require the performance of work-related activity precluded by this RFC, and that accordingly, Plaintiff was not disabled as defined by the Act. Tr. at 19-21.

---

[9]   Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. § 404.1567(a).

> "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday. Unskilled sedentary work also involves other activities, classified as "nonexertional," such as capacities for seeing, manipulation, and understanding, remembering, and carrying out simple instructions.

Social Security Ruling (SSR) 96-9p, 1996 WL 374185, at *6-7 (July 2, 1996).

## DISCUSSION

### Standard of Review and Statutory Framework

In reviewing the denial of Social Security disability benefits, a court must affirm the Commissioner's decision "so long as it conforms to the law and is supported by substantial evidence on the record as a whole." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005). This "entails 'a more scrutinizing analysis'" than the substantial evidence standard. Id. (quoting Wilson v. Sullivan, 886 F.2d 172, 175 (8th Cir. 1989)). The court's review "'is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision'"; the court must "'also take into account whatever in the record fairly detracts from that decision.'" Id. (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)). Reversal is not warranted, however, "'merely because substantial evidence would have supported an opposite decision.'" Id. (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir.1995)).

To be entitled to benefits, a claimant must demonstrate an inability to engage in any substantial gainful activity which exists in the national economy, by reason of a medically determinable impairment which has lasted or can be expected to last for not less than 12 months. 42 U.S.C. § 423(d)(1)(A). Work which exists in the national economy "means work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id. § 423 (d)(2)(A). Both the impairment and the inability to engage in substantial gainful employment must last or be expected to last for not less than 12 months. Barnhart v. Walton, 535 U.S. 212, 217-22 (2002).

The Commissioner has promulgated regulations, found at 20 C.F.R. § 404.1520, establishing a five-step sequential evaluation process to determine disability. The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If so, benefits are denied. If not, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments. A severe impairment is one which significantly limits a person's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1521(a).

If the claimant does not have a severe impairment that meets the duration requirement, the claim is denied. If the impairment is severe and meets the duration requirement, the Commissioner determines at step three whether the claimant's impairment meets or is equal to one of the impairments listed in Appendix I. If the claimant's impairment is equivalent to a listed impairment, the claimant is conclusively presumed to be disabled. Otherwise, the Commissioner asks at step four whether the claimant has the RFC to perform her past relevant work, if any. If the claimant has past relevant work and is able to perform it, she is not disabled. If she cannot perform her past relevant work or has no past relevant work, the burden of proof shifts at step five to the Commissioner to demonstrate that the claimant retains the RFC to perform a significant number of other jobs in the national economy that are consistent with the claimant's impairments and vocational factors -- age, education, and work experience.

If a claimant can perform the full range of work in a particular category of work (very heavy, heavy, medium, light, and sedentary) listed in the Commissioner's

regulations, the Commissioner may carry this burden by referring to the Guidelines, which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment. Where a claimant cannot perform the full range of work in a particular category listed in the Guidelines due to nonexertional impairments such as pain, the ALJ cannot carry this burden by relying exclusively on the Guidelines, but must consider testimony of a VE as to whether there are jobs in the economy that the claimant could perform. Here the ALJ decided at step four that Plaintiff could return to her past work as a secretary.

**ALJ's Assessment of Plaintiff's RFC**

Plaintiff argues that the ALJ's RFC assessment is not supported by substantial evidence in the record. A disability claimant's RFC is the most he or she can still do despite his or her limitations. 20 C.F.R. § 404.1545(a)(1). In McCoy v. Schweiker, 683 F.2d 1138 (8th Cir. 1982) (en banc), the Eighth Circuit defined RFC as the ability to do the requisite work-related acts "day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." Id. at 1147. The ALJ's determination of an individual's RFC should be "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)).

Although a claimant's RFC is determined at step four of the sequential evaluation process, where the burden of proof rests on the claimant, the ALJ bears the primary responsibility for determining a claimant's RFC. Id. As noted, an RFC is based on all relevant evidence, but it "remains a medical question" and "'some medical evidence must support the determination of the claimant's [RFC].'" Id. at 1023 (quoting Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001). The ALJ is therefore required to consider at least some supporting evidence from a medical professional. Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Here the ALJ's RFC assessment is supported by Dr. Palen's August 4, 2004 evaluation. After examining Plaintiff, Dr. Palen opined that she should have no limitations with regard to physical work-related functions. It was permissible for the ALJ to consider Dr. Palen's comment that he was not convinced that Plaintiff made a good effort in the strength testing. See Baker v. Barhnart, 457 F.3d 882, 893 (8th Cir. 2006) (stating that an ALJ may consider indications of symptom exaggeration during a functional capacity examination); Kelley v. Barnhart, 372 F.3d 958, 961 (8th Cir. 2004) (stating that an ALJ may consider a claimant's unresponsive or exaggerated responses during a medical examination).

Plaintiff's refusal to be treated with steroid injections because she supposedly did not want anyone putting needles in her back also supports the ALJ's decision that her pain was not disabling to the extent alleged. See Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) ("Impairments that are controllable or amenable to treatment do not support a

finding of total disability."); <u>Roth v. Shalala</u>, 45 F.3d 279, 282 (8th Cir. 1995) (stating that the failure "to follow prescribed course of remedial treatment, without good reason, is grounds for denying disability benefits").

The medical evidence shows the presence of degenerative disc disease, and past arthroscopic surgery on Plaintiff's right shoulder, which would preclude Plaintiff's past work at the Tyson Foods facility. However, there is substantial evidence in the record supporting the ALJ's decision that Plaintiff could return to her past work as a secretary. The demands of that job are delineated in the record. Significantly, when Nurse Vaughan opined on the June 14, 2004, that Plaintiff's physical impairments made it "questionable" whether Plaintiff would be able to return to her assembly-line work at Tyson Foods, Nurse Vaughan clearly indicated that Plaintiff would be able to perform lighter work. Tr. at 155.

**Plaintiff's Subjective Complaints**

Plaintiff also argues that the ALJ committed reversible error by requiring objective evidence of pain, and by failing to give appropriate weight to Plaintiff's subjective complaints. "A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question." <u>Gonzales v. Barnhart</u>, 465 F.3d 890, 895 (8th Cir. 2006). In assessing the credibility of a claimant's subjective pain complaints, an ALJ is to consider factors including the claimant's prior work record; the claimant's daily activities; observations of the claimant by third parties and treating and examining physicians; the duration, frequency, and intensity of the claimant's pain; precipitating and aggravating factors; the dosage, effectiveness, and side

effects of the claimant's medication; treatment, other than medication, for relief of the claimant's pain; and functional restrictions on the claimant's activities.  Polaski, 739 F.2d at 1322.  Although "an ALJ may not disregard [a claimant's] subjective pain allegations solely because they are not fully supported by objective medical evidence, an ALJ is entitled to make a factual determination that a [c]laimant's subjective pain complaints are not credible in light of objective medical evidence to the contrary."  Ramirez v. Barnhart, 292 F.3d 576, 581 (8th Cir. 2002).

Here, a review of the ALJ's decision shows that he considered the entire record, including objective and opinion evidence, treatment measures and treatment measures refused, Plaintiff's solid work history, and her daily activities.  The ALJ cited Polaski, as the correct legal standard for evaluating Plaintiff's allegations.  The question before the ALJ was not whether Plaintiff had pain and limitations, but rather whether her allegations of pain and limitations were credible to the extent that they prevented her from performing her past work as a secretary.  See Clark v. Chater, 75 F.3d 414, 417 (8th Cir. 1996) (explaining, where claimant complained of constant pain in hands, arms, and shoulders, that real issue before the ALJ was whether the pain prevented claimant from performing any kind of work).

The Court does find somewhat troubling the ALJ's belief that Nurse Vaughan's notation in her August 6, 2005 report, following Plaintiff's car accident, that Plaintiff "was not moving [her neck] voluntarily much," showed that Plaintiff "was motivated to exaggerate symptoms when it suit[ed] her purposes."  Nevertheless, it is not for the

reviewing Court to substitute its opinion for that of the ALJ, who is in a better position to assess credibility.  *See* <u>Eichelberry v. Barnhart</u>, 390 F.3d 584, 590 (8th Cir. 2004) (upholding ALJ's credibility determination based in part on his belief that plaintiff's incentive to work might have been inhibited by the private long-term disability check she received each month).  Here the ALJ did not rely solely on the lack of objective evidence of disabling pain, and the Court cannot say that he improperly weighed the credibility of Plaintiff's subjective complaints as to the debilitating extent of her pain and limitations. *See* <u>Charles v. Barnhart</u>, 375 F.3d 777, 784 (8th Cir. 2004) (affirming ALJ's determination that plaintiff's pain did not preclude light work, where plaintiff was taking Darvocet to control the pain, and consulting physician's opinion regarding plaintiff's limitations placed plaintiff in the light exertional work category); <u>Johnson v. Carter</u>, 87 F.3d 1015, 1017 (8th Cir. 1996).

**<u>Combination of Impairments</u>**

Plaintiff also argues that the ALJ erred in failing to consider the impact of the combination of Plaintiff's impairments on her ability to work.  This point is without merit. It is true that an ALJ must consider a disability claimant's impairments in combination.  20 C.F.R. § 404.1523; <u>Anderson v. Heckler</u>, 805 F.2d 801, 805 (8th Cir. 1986).  However, if the ALJ discussed each of the Plaintiff's impairments and concluded that neither rendered the plaintiff disabled, no further analysis is required.  <u>Browning v. Sullivan</u>, 958 F.2d 817, 821 (8th Cir. 1992).  "To require a more elaborate articulation of the ALJ's thought processes would not be reasonable."  <u>Id</u>.  Here, the ALJ specifically noted several times

that impairments must be considered in combination. He discussed each of Plaintiff's claimed impairments and still decided that she was not disabled, and that determination is supported by the record.

## CONCLUSION

Although the evidence in the record could support another result, this Court cannot say that the ALJ's decision was not supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.


_____
AUDREY G. FLEISSIG
UNITED STATES MAGISTRATE JUDGE

Dated on this 25th day of September, 2007